Thank you. You may be seated. I'm Justice Sharon O. Johnson, presiding judge of the 5th Division and I am joined by my colleagues Justice Mitchell and Justice Navarro. We want to thank you all for your willingness to come out into the community today to present this case so that the community knows exactly what it is that the appellate court does. We're going to begin by having the counsels introduce themselves, state your names, and who you represent. You'll each be given 20 minutes in which to present your case, beginning with the appellant, followed by the appellee, and then the appellant will have time for rebuttal. So, can I have the appellant please state your appearance for the record. Good morning, Your Honors. Karen DeGrand on behalf of the defendant appellant, Advocate Health & Hospital System, doing business as a consumer in a hospital. Thank you. Good morning. David Nordwall on behalf of Plaintiff Appellees, Bozina, also known as Bessie Benkowski, individually and on behalf of the independent administrator of the Estate of Philip Carano. Okay. Thank you. Okay. Appellant, you may begin. Before you begin, how much time would you like to reserve for rebuttal? Five minutes, please, Your Honor. Okay, very well. Good morning, Your Honors. Again, Karen DeGrand on behalf of the defendant appellant, Advocate Health & Hospital Corporation, doing business as Good Samaritan Hospital. May it please the Court, Counsel. Your Honors, plaintiff did not prove proximate causation at trial. The only way to reach a different conclusion is by disregarding all of the expert testimony establishing that the death of Plaintiff's decedent, Philip Carano, was not reasonably foreseeable when he was discharged from Good Samaritan Hospital. We've asked the Court to grant J&OV, or alternatively a new trial, or another alternative to order a remittitor that substantially reduces the $5 million judgment. The primary issues before the Court. First, the record does not establish either strong approximate causation, actual or legal cause, needed to defeat Advocate's motion for directed verdict in the trial court or its motion or request for J&OV in this court. Based on the testimony of Plaintiff's sole expert witness, which forecloses the finding of legal cause and the undisputed evidence of the event several weeks after Mr. Carano left Dr. Hassan's care, the Court should find the record meets the PEDRA standard for J&OV. Second, the record demonstrates significant and prejudicial Supreme Court Rule 213 violations, which deprives Advocate of a fair trial. The Circuit Court failed to remedy even a violation Plaintiff acknowledged with respect to her expert testimony. Individually or in combination, the violations, along with other matters raised in their briefs, diverted the jury's attention from the insufficient causation testimony and deprived Advocate of a fair trial. And third, I'll address remittitor as an alternative form of relief from the excessive judgment that is the product of passion and prejudice and that far exceeds fair compensation, considering the evidence presented at trial. I'll begin with the issue of proximate causation. Your Honor. Counsel, because we do have an audience today, I would ask that you give us a little background on the facts of the case. On the facts of the case, I'd be happy to, Your Honor. Your Honor, it's a medical malpractice case that involved the plaintiff's allegation that Advocate, through one of his psychiatrists in the behavioral health unit at Good Samaritan Hospital, was negligent with respect to the care and treatment rendered to plaintiff's decedent after he was admitted into the inpatient in a restricted ward for an extraordinarily long period of time for these types of hospitalizations, 52 days. And the allegation that the plaintiff's expert, Dr. Jacobs, voiced for the plaintiff at trial was that Advocate, through Dr. Assange, deviated from the standard of care by discharging Mr. Carano on January 27th of 2015. And that's the main issue of the case. Okay. Regarding legal cause, this focuses the court's and, of course, the party's attention on foreseeability. Does the case involve the type of harm that a reasonable person would see as a likely result of her conduct? The Supreme Court and, of course, this Court views legal cause with a policy lens. How far should a defendant's legal responsibility extend for the conduct that the plaintiff attempts to tie to the— Your Honor, I have to disagree with your characterization of the evidence following discharge. The evidence does not support the conclusion that his—Mr. Carano's, that is—condition deteriorated precipitously upon discharge. In fact, the evidence is to the contrary. where he talks about how he's wandering around and he's despondent and he's, you know, sad and that sort of thing. So that's some evidence from which the jury could conclude that he had declined. It certainly sounds like he was in a different condition than he was at discharge. Well, I, again, have to disagree with the Court because, first of all, as for the nanny, she's not in any position, and we cited authority for this concept, to offer an opinion as to the decedent's condition. But more generally— Well, she can certainly testify to what she saw. She can testify that he was sad. Yeah, and that he smelled bad. He hadn't bathed. Okay. But that does not—that doesn't—that does not support the notion that he was—had medically deteriorated. And Dr. Habich's observations as an internist who examined and discussed with the patient his symptoms, that doesn't support, in my view, a conclusion that he deteriorated. In fact, if you look at the testimony of Dr. Nieher, who saw him on February 21st, actually the day of his death, his assessment actually confirms the opposite, that he was—he had—his GIS score, for example, had increased from what it was at discharge, which was 40, to 55, a significant improvement. And that's not to say that there wouldn't be times when this man, who had what Dr. Assange described as controlled mental illness, that doesn't mean that on certain days he would not have—display some issues of depression and so forth. But that's the problem, isn't it, that it could have been anything. In this case, it was the service of the order of protection. But wasn't it foreseeable that anything could have set him off or caused him to commit suicide? And that is the very reason why he should not have been sent to this independent living as opposed to an ICF facility. Well, so I'll disagree with the Court for this reason, Your Honor. The testimony was that this was the type of place, at least this was the type of place from the defense point of view, that met his needs. And the testimony of the contrary that was offered by Dr. Jacobs, that he should have, for example, been kept in the facility, in an advocate's facility for a longer period of time, that he should have—that there should have been some additional coping strategies that he would have learned. There is no connection that the plaintiff, or I should say Dr. Jacobs, was able to make between offering those, well, you could have tried this and you could have tried that and you could have tried this and you could have tried that. There's nothing—he doesn't offer any testimony that says, and this is what that would have led to. You're saying that had he been given this alternate, whatever that alternate treatment is, the ICF treatment, that would have prevented what ultimately happened? Well, I don't think he said it would have prevented it. He said—so what—and, you know, the other aspect of this that I think is very significant, Your Honor, is that when the court considers the experience of Mr. Carano, sadly, in the summer of 2014, when he was under the care of Dr. Gilles and was admitted to Alexian Brothers for inpatient treatment, and there was no criticism by Dr. Jacobs of that treatment, and there was a step down to an ICF situation or to a— actually, it wasn't an ICF, it was to intensive outpatient care and also continuing treatment by Dr. Gilles. It didn't prevent what happened. There was improvement for a period of time, and it didn't prevent what happened on December 2nd, which was a suicide attack. But that informs—that should inform or could inform the subsequent discharge. Knowing that that's what happened in 2014, now here we are in 2015, could that inform a son's assessment when he's discharging Mr. Carano to his independent living place? When on the 26th, the nurse is saying that he's having suicidal ideation at that point. The day before, he's going to an independent living facility. And Dr. Hassan made her own independent assessment and came to the conclusion that he was—his illness was controlled. Nobody is suggesting that Dr. Hassan or anyone could provide a medication or another ECT treatment or some sort of coping strategies or what have you and cure him. But hadn't Dr. Hassan had earlier in January, correct me if I'm wrong, but my recollection is that she had approved him for an additional 30-day stay in the hospital. She hadn't made the decision that he would stay for longer, but earlier she had said that that would be a potential. But, you know, also look at her testimony, Your Honor. And her testimony was, you know, she makes an assessment after the ECT treatment, and that's really an important part of the situation. He went from—after he had six ECT treatments and then he had nine ECT treatments, he was remarkably improved. And the doctor—so what I'm hearing a little bit of from the court, and I have to take issue with it, is if you have him locked up forever, would that prevent anything adverse from ever happening to him? And is that legal foreseeability under Illinois law? I take issue with that, and I think that an Illinois court would take issue with that. Well, there are some people who are committed involuntarily, and they're held for extended periods of time precisely because of that. But that wasn't what Dr. Jacobs said was a deviation from the standard of care. Right. This is just in response to your outrage that this would be something that people might think as a remedy, that is to say, well, yeah, we'll keep him in longer. I'm looking at it from the standpoint of legal causation, Your Honor, and the policy— You flash on to something that Dr. Jacobs said on cross, which was no given suicide can be predicted. And I guess my reaction to that is tell me what heart attack is predicted. Tell me what other—tell me when a stroke is going to be predicted, when somebody is discharged from the hospital and two weeks later has a cerebral hemorrhage or somebody has a massive heart attack. I mean, yeah, of course, in medicine there's a certain—there's always a certain degree of uncertainty, but to accept that as a bar would mean you'd never have a recovery in a suicide case in a medical malpractice context. There's a difference, and a significant difference, Your Honor, in a suicide case. And that's reflected in Illinois law. And that is the general rule that the act of—if the Court would like to interrupt me now. We call that a general rule? And it was. It was the rule for many, many years. But now we say there's this exception. Doesn't the exception essentially swallow the rule? It's one of reasonable foreseeability. I think it—I don't think it swallows the rule. I think it depends on the testimony that's before the Court, that's before the jury. I think it depends on the factual circumstances. And while there may be—there could be situations, and nobody has said that it's this situation, where it would be within the standard of care to require Dr. Hassan to say, okay, you're in for life. I mean, that is such an unusual situation. And I think we know that from the testimony. Let's say that it isn't that he's in for life, but he's going from suicide prevention level two on the 26th. That's where he's at on the 26th. That's the testimony. He's in independent living, where I think Hassan says he's going to see a doctor at some point while he's there, at time or time. That actually is not exactly right, Your Honor, because there was, in the discharge notes, there was an order that called for him to be seen by an internist, him to be seen by a psychiatrist, him to be seen for psychological help, and all of those things happened, including with the psychiatrist, Dr. Aldura, who saw him on January 30th, three days after he was at Concord. Counsel, how do you reconcile that Dr. Hassan's note on January 23rd, 2015, indicated that Carano was scheduled to meet with an ICF, an intermediate care facility, but instead he met with this independent living facility? I swear it, because that was what was available, and it was determined to be an appropriate place. Again, we're talking about his situation before the end of his ECT treatment, and her final evaluation after 29 examinations of this man while he was in the behavioral health unit for over seven weeks, and she assessed him and found that he was at low risk for suicide. I swear it that way, and I also swear what was said about Concord Place. Again, it's not a facility where there's no assistance. There is assistance. There was assistance to make sure he was taking his medication. There was housekeeping. There were meals. There was socialization. There was transportation. There was access to doctors, as we know, because he did have his initial visits with Dr. Habich, Dr. Aldura, and then by the 7th, he missed an opportunity to meet with Dr. Nieher, but then scheduled the meeting that took place then on February 21st. So I don't think it's accurate to say that this was, or for the court to infer that this was some sort of a haphazard situation. It wasn't. Well, what's the difference then between an intermediate care facility and an independent living facility? I think there's more assistance. I think there's probably more daily assistance. In which one? In the intermediate care, potentially, but that wasn't ever specified. That's just my supposition. That wasn't ever specified by Dr. Jacobs, and Dr. Jacobs, you know, throwing out all of these, this was wrong, this was wrong, this was wrong, this was wrong, where did it take him? Where would it have taken him? And, you know, the other part of this, Your Honor, is, and then, you know, this really is an important part of the legal cause issue. What is the policy that would be furthered here by saying, all right, after these seven weeks of treatment, intensive treatment, and as Dr. Hassan pointed out, you know, at some point, it is not good for the patient to be locked up. And at some point, it is better for the patient to be on the outside, where the patient can start seeing if he can cope. Mr. Carano was talking about trying to find a job. He did, you know, yes, was he 100% cured of depression? No. That wasn't going to happen. But his mental illness was controlled. He was taking his medications. He was compliant with his medications. And the question, really, I think, I'll pose to the court, for the policy issue is, are we, when a mental patient is at the end of his care with a psychiatrist like this, and at the end of the time where he is residing in an inpatient facility and that ends, how far in the future are you requiring the physician, the psychiatrist, to view what could happen? Is the psychiatrist required to consider all of the potential adverse personal events that conceivably could happen and then keep them in the facility? It doesn't make sense. It doesn't make sense from the standpoint of medical care, of mental health care, and it doesn't make sense from the standpoint of these types of very dedicated professionals being available to help people who have mental illness. There is not a guarantee. There is not a lifetime guarantee that a patient like this is going to  The physician is not the insurer of the patient. I get that. So if 25 days is too long, where should the line be drawn? A week? A day? I mean, I think it probably depends on the situation. But there's nothing here about what Dr. Jacobs said and the way he criticized Dr. Assange that bridges that gap. And the other part of this is, too, his actual testimony is that suicide is not foreseeable. He specifically testified foreseeing and predicting suicide are one and the same. That's how he defined the concept of foreseeability. It is. Right, but foreseeability is a legal question, not a factual question or a medical question. Well, but the case law, Your Honor, that addresses the suicide cases poses foreseeability as an ultimate question of fact. So we know that the plaintiff had the burden of establishing a You would concede that in a legal conversation, predictability and foreseeability are not coextensive. I'm talking about, I'm not conceding that. Not the way he testified. Not the way he testified. He linked those two things, and that is the testimony that is in the record. And he did not testify, and even though the plaintiff says, without really even addressing any of the testimony that we quoted. I thought we were in agreement at the outset when we had our little chat that suicide is never predictable. Suicide is, that's exactly what he said. Suicide is never predictable, and he went beyond that, though. He linked, and he said it's one and the same, foreseeability and predictability. He says 99% of the people at risk for suicide in any year do not go on to commit suicide. This is what is dealing, this is what Dr. San is being faced with when she, when the court is judging this issue of reasonable, what was reasonably foreseeable to her. I don't think that the case law, I don't think there's a single case that supports the idea that the burden on a psychiatrist in this situation is to somehow, and it's not, we don't know about it, what it would be from Dr. Jacobs, somehow provide somebody who is ill like this, who is brought forward to the point where he has controlled mental illness, they can give him the magic to determine whatever and deal with, cope with any adverse event. That's too much of a burden you're under. Counsel, I've been sitting here resisting giving you a hypothetical, but I think I'm going to do it anyway. Okay. And that is, okay, you have a 92-year-old that goes to emergency for a busted hip. And they're admitted to the hospital, they're treated as much as they can, and the doctor decides to release that person home as opposed to rehab. And you release them home, isn't it foreseeable that something is going to happen? You don't know whether it's going to be a trip up the stairs or a trip over the sidewalk or any number of things could happen to re-injure the hip. But it's foreseeable that without rehab that that person is going to be re-injured. Why isn't this similar? That there should be some intermediate step between the care that he was receiving under Dr. Hassan's care and an independent living facility. So here's why I think your hypothetical doesn't work in this situation, Your Honor. You're going to be shocked that I'm not agreeing with you. But what we have here is an intervening event. And that's not, it's just not the same situation. And it's not just a suicide. It's the purposeful service of an order of protection that told Mr. Carano, you're not going to see your children. You're not going to have contact with your children for two years. Is she required to foresee every intervening event? Because that's what this is. And then precipitated the suicide. So I don't think that fits your hypothetical. But I think your hypothetical, if you'll excuse my saying so, might be incomplete because are you talking about something that happened when? Forever? Because I think that that's frankly, I don't know how to put any kind of limits on what Dr. Jacobs says. And he doesn't really give us any way to do that. And that's the problem I have with his testimony. Maybe in this specific factual consideration, they weren't being asked to take it out to a year later. Really, in these facts, it's happening February 21st? February 21st. February 21st after a discharge on January 27th. So that's really what they were, they weren't looking, they weren't being asked to consider out a year. They were really being given a factual situation where it was 27th on suicide, 12th to discharge, February 21st. And that's almost a month after his discharge. And to place that burden on a mental health care professional, I don't think squares with the case law and legal context. Earlier then, when my colleague was asking me how far out did it go, it doesn't go. It's less than a month. Well, it certainly doesn't go for this situation. And Dr. Jacobs didn't give us any way to assess that. Counsel, you're running out of time, but I'd like for you to address the remitterer argument. I will be happy to address that, Your Honor. And, you know, without going too deep into the long and problematic battle, or what was thought to be an agreement but turned out to be rejected by the Plaintiffs' Council, that's related, and so I'll just briefly touch on that, and then I'll talk about the... So this is one of the significant Rule 213 issues that's for the court's consideration, which is plaintiff's manipulation, which was leading up to the trial, regarding the testimony of the Carano children. And Ella Carano, Ms. Carano, 14 years old at the time of his father's death, 21 at the time of trial, should not have been permitted to testify, is our position. And she was allowed to testify based on plaintiff's gainsmanship. Wasn't any harm from that violation ameliorated by the fact that you were able to take her deposition? So you took her deposition before she testified. It wasn't, Your Honor, and for one important and specific reason. She identified for the first time, and we're in the trial now, she identified for the first time that she had been undergoing grief testimony for a year. That had never been disclosed, and when the plaintiff filed or served the 213-F1, that was the date to coincide with when she was getting that help, and we had no ability to either plan for that and to test it. And so it was very significant, and the fact that that was permitted, and there was no determination by the trial judge other than to observe that the conduct of plaintiff's counsel was not civil and that defense counsel should think twice before ever giving another accommodation. Accommodations that were given at the plaintiff's request to shield the children, we were told, from the fact that they didn't know that their father had committed suicide. So there was this ongoing issue that, and then once we got closer to trial, and then my partner is thinking, all right, do we push this issue of the depositions, and then a month before trial, we get a witness list, she's not on it. But then it goes back and forth and back and forth, and then we wind up with this deposition. So I think that's a significant issue, and to go back to remitter, Your Honor, we're talking about a $5 million award. A million of it, in our view, should be taken away from that award for Mr. Carano's emotional distress, because even if, for the sake of this argument, we concede that, for the sake of this argument, that there was emotional distress that happened in the Concord timeframe, where is the testimony that links it to the alleged negligence of Dr. Hassan? Nowhere. And the fact that somebody has an injury or a problem or some sort of a damage and it's not linked to the negligence, that is not compensable. This is an issue that we review for an abuse of discretion. This was presented to the trial judge. Yes. And she made certain conclusions, and unless her conclusions are so completely unreasonable, under an abuse of discretion standard, we defer to how the trial judge handled it, right? The 213 issue? Well, 213, but also remitter. Okay, remitter. I would say that her ruling was an abuse of discretion because there was no testimony to support it. How could that not be an abuse of discretion? Oh, I know, but she cited the testimony of the housekeeper or the nanny, and she cited the observations of Dr. Hebich, right? Because this issue also reared its head in the jury instruction conference, right? Your partners objected to the instruction. There was a discussion about it then, and she said, I just heard evidence that would justify giving this instruction. Okay. Well, that was an inaccurate observation, and there isn't one word in the trial record that links that distress, claimed distress, to Dr. Hassan's negligence. It's one thing to say that somebody has distress. It's got to be linked, and we've had cases on that, and there wasn't any. Cases where awards are remitted, they're really at the outer extreme, right? Because we're trying to be deferential. Making an award of damages is primarily the job of the jury, not a judge. And so, rightly so, we're quite deferential. And this isn't a case, for example, and we have had cases like this where a plaintiff stands up and asks for X amount of dollars, and a runaway jury gives them three times or more what they're seeking. This was a case where the plaintiff's counsel stood up and asked for $38 million and $5 million on the emotional distress, and the jury gave them $1 million on emotional distress, $5 million total. That's also a fraction of what they actually were asking for. Is that really a runaway, unreasonable jury? The verdict is, so let's, can I back up? Because there are a couple of questions in your question. There is. It was compounded. If I may. So, first of all, the fact that the plaintiff asked for an outrageous amount of money doesn't mean like, you know, okay, now if we just cut it down to a certain amount, then there should be deference. But in the case of this, one measure of an unreasonable jury, one sign of an unreasonable jury verdict is where the jury comes in with an award substantially more than they were ever asked for. As far as, yes, the jury is charged with finding damages, but it is the court's responsibility. It is this court's responsibility, and we know this from numerous cases, from the Best case, from the LeBron case. Every case recognizes this important principle, that when there is an award that is the product of passion and prejudice or is not supported by the damage or by the evidence, it is the court's responsibility. And the jury deliberated for three days, right? That's correct, Your Honor. That's correct, Your Honor. And that's one of the ways that we know that the Rule 213 violations were impactful, especially because one of the jurors sent a note to Judge Brosnahan saying, and this was on day two, I can't sign for the plaintiff. I think that Dr. Ahsan gave excellent care, even heroic. That's a quote. So we know the 213 violations were impactful. But going back to remitter, it is the court's responsibility when the evidence doesn't support the award or whether it's the product of passion and prejudice. And I think the $4 million for plaintiff and her children is also excessive. And it's the product of, you know, the estrangement points in the direction of a remitter. And also the improper testimony that was permitted from — Ella Carano never should have been permitted to testify. And she was — I'll be here, counsel. You still have time for rebuttal. Okay. Thank you, Your Honor. I'm sorry I talked so long. Oh, no, that's okay. That's all right. Thank you. And, counsel, you won't be limited to the 20 minutes. So we'll give you a little extra time if you need it. Is it okay if I adjust this a little bit? Yes. Is it okay? I don't want to cause any technical problems. I'm just a little out of my way. Excuse me. May it please the Court. Again, my name is David Nordwall on behalf of Plaintiff Appellees. The primary issue in this case is the JNOV, based upon the oral argument that I heard. And I just want to make it clear that the JNOV is not proper if there is any evidence, together with reasonable inferences drawn therefrom, demonstrating a substantial factual question. There is no reweighing of the evidence by this Court. There is no, I believe this witness and not that witness. That's not the test of the JNOV. And the trial court applied it properly, which is that there was evidence that supported the finding of proximate cause. So the JNOV is not proper. As the Court is aware, there's two elements to proximate cause, cause in fact and legal causation. Let me focus on legal causation because that seems to be what the Court was most interested in with the appellant's counsel. And that is legal causation involves an assessment of foreseeability. And the Illinois Supreme Court held in the Stanfield case that while suicide is often unforeseeable and thus not a legal cause, Illinois courts have held that where a plaintiff can show that the suicide was a reasonably foreseeable result of the defendant's conduct, liability will attach. And it's really, that's the hook in this case, is that was it foreseeable from the defendant's conduct? Was it foreseeable from the discharge? Counsel's point, that Dr. Jacobs equates foreseeability with predictability, and everybody agrees it's not predictable. He says more than that, though. He says that also that psychiatrists can assess the risks that a person has for a suicide, can assess the risks. I'm sorry, I'm hearing an echo. I'll move it aside a little bit, I apologize. That they can assess the risk of suicide and that they can take steps to avoid it. So while no one can predict with 100% certainty that someone's going to commit suicide, just like you indicated, Justice, that no one can predict or ordinarily predict with 100% certainty that someone's going to have a heart attack, there are risk factors that can be considered and determined if someone is at risk for suicide. And the most obvious one in this case is that on January 27th, when Phil was discharged, he expressed suicidal ideations. So to say that it was not foreseeable for Dr. Hassan that he would commit suicide when the day that you're releasing him, out into the wild essentially, that he is saying he is thinking about suicide and having ideations. I think out into the wild is a little bit of a stretch. But let's go back to the idea that your opposing counsel makes reference to the Independent Intervening Act, which is the extension of the Order of Protection. It can be considered, that is one, could be considered an Independent Intervening Act. So, okay, if we talk about that he's at a suicide risk, everything else being the same, what happens in this instance is after that extension, he takes his life. How was Dr. Hassan supposed to be able to know that, predict that out, that there was going to be this extension of the Order of Protection? Because I think in your brief you make the argument that she should have known that. She should have known that that was a natural consequence of the initial emergency order. I believe it was more than that. I believe across examination she conceded that it's often a permanent one or a plenary one follows a temporary one. So now the standard should be that the doctors need to know the procedures for domestic orders of protection. Well, first of all, it's ultimately going to be the question for the jury to determine the reasonable foreseeability. So that could be a factor in this type of case. What Dr. Jacobs identified as the risk factors, he said, that you can assess and treat patients if you identify risk factors for suicide. The risk factors that he identified include depression, a prior suicide attempt, up to one year after the hospitalization, feeling helpless and worthless, and that also stressors, which include such things as a loss of a job, which triggered him in December of 2014, and also orders of protection, are also risk factors for suicide. It could be the triggering event. So in this case, you look and see what happens. He suffered a stressor in December and he committed suicide. He had no supports around him. Take it to what happened in December, where he has all the supports around him, and when he's given the order of protection, he has supports around him that help him process it and understand what it is and able to give him the coping mechanisms to go on. What happened, and it was Dr. Jacobs, as he was appreciated standard of care, to release him in January 27th, release him, first of all, because of the suicidal ideations, that his depression was not under control, but also he had not fully developed his coping mechanisms and he didn't have supports. So when I said he was out in the wild, really, a place he could have gone was an intermediate care facility, where, even though it's not as intensive as the inpatient unit, he would have counseling every day. He would have therapy. He would have group therapy. He would have bimaloo therapy, which is around others. He would have a support group. What happened is that he was sent to Concord Place. Concord Place is an independent living facility. It has a nursing home for elderly people, but in the area that he was in, they provided meals and housekeeping services. There was no doctor actually on staff, even though they had contracts where some doctors were there to come there, come into the office. For example, the psychologist, I believe, testified he only came on Saturdays. He wasn't full-time and he wasn't on staff. There was no supports for him. But the Concord staff was aware of his needs before they admitted him, correct? Did they meet with him? They met with him like three days before. I think it was on the 23rd or 24th that he met with him, and then he was accepted the next day. But the director who testified at trial said that he doesn't have any discretion, any real discretion. He has to accept basically anyone that comes in, and he can't reject people because of mental health issues. So he had to accept them. It wasn't one where there was an evaluation. There was no decision made by Concord Place that this is a proper fit for Mr. Coronavirill. There was no evaluation like that. It was rather like, well, yeah, you can come. We don't have any mental health people on staff. We can do medicine reminders. It's not making sure they took the medicine, but they will come by every day, knock on the door and say, hey, don't forget to take your medicine. And that's the extent of the services provided to you. So there's an argument raised in the brief that Dr. Jacobs was not qualified to testify. He hadn't discharged a patient in 35 years. There's also another problem with Dr. Jacobs in a 213 violation, and at least in the briefs it was argued that a trial judge abused her discretion and even allowing him to testify. I'll address the qualifications first. There are few people more qualified to offer an expert opinion on this issue than Dr. Jacobs. He's one of the leading experts on suicide treatment and prevention in the United States. He created and he's the editor of the Harvard Medical School Guide to Suicide Assessment and Intervention that is used as a textbook. So it's not just a publication. It was reviewed. It's used as a textbook at Harvard University. Following the publication of this handbook, he was asked to chair a working group of the American Psychiatrist Association in the early 2000s to develop guidelines for the assessment and treatment of patients with suicidal behaviors. That's what's at issue in this case. Is it properly assessed and is it properly evaluated and treated? And it resulted in the publication of practice guidelines on suicide in 2003. He was also on the committee to update those guidelines in 2015. He continued to see patients. While he does not actively discharge patients right now, he testified at trial that he teaches doctors how to prepare discharges and to prepare discharge orders to discharge patients. He also consults with doctors like Dr. Hassan who are treating patients with suicide risks. He consults with them to tell them and suggest how to give proper treatment and what to do. So he clearly met the qualifications. Many objections that, oh, he hadn't personally done a discharge statement in the last however many years, that goes towards the weight and not the weight that should be given to his testimony and not a permissibility. With respect to the 213 objection and the 213 violation, with respect to Dr. Jacobs, the trial court found that there was a violation because it had not been previously disclosed that Dr. Jacobs had reviewed the records of Dr. Giolos, who was the treating psychiatrist, off and on for Phil. That he gave last year in the middle of the fall of 2014. But Dr. Jacobs did not testify about Dr. Giolos' records during his direct examination and did not say his opinions were based upon it. And as soon as the violation came out, the trial court took prompt action and promptly sanctioned plaintiff by instructing the jury about this discovery violation and that any of Dr. Jacobs' opinions about the records should be disregarded. As the judge really laid out in her ruling on the post-trial motion, she went through all the factors that should be considered in handling the sanction for a 213 violation, and her approach and her response is not an abuse of discretion. And really, in large part, because there really wasn't a prejudice to advocates. Well, there was a prejudice. It was not unfair prejudice, right? They were deprived of the gotcha moment on cross-examination that they had prepared for. I agree completely. They lost the one question of you didn't even read his records. They lost that surprise, but what they didn't lose was when they went through the records, do you recall him saying that? Do you recall him saying that? So they still got all that out. What they lost was the aha moment, absolutely. And to the extent that that's prejudice, okay. But it's not unfair prejudice, and it certainly doesn't show an abuse of discretion by the trial court. Counsel, how do you answer your opposing counsel's, the question she posed to us, how far should the doctors look into the future? How far should they be required to look into the future? When, especially in this instance, you do have this independent intervening act. So how far should they be required to look into the future? January 27th to February 21st. I think there's no bright line test. I don't think you can say it was a month. You can say it was a week. You can say it was a year. There's no bright line test. It really is going to be the facts in this case, and that's the facts in this case. If she had not discharged, if she had kept him there on January 27th, or if she discharged him to an intermediate care facility where there was assurance of support, the fact that maybe those supports ultimately failed would not necessarily mean, I think a jury could find that, well, it was not reasonably foreseeable because she discharged him to a place where she made sure that supports were in place and that he would have them. How does the jury know about that? They have to rely on an expert to testify to that. One of the criticisms is that there wasn't testimony, for example, on the emotional distress to the deceased. There's nothing that links it to a deviation from the standard of care by the doctor. There is clear testimony that the conduct of discharging Mr. Carano on the 27th of January, discharging him at all was a breach of the standard of care, and also discharging him to Concord Place, to an independent living facility, that those were breaches of the standard of care and that it led to his suicide. So then the evidence shows that he deteriorated from the time that he released, from the time he left on January 27th until February 21st, there's evidence that shows that his mental condition deteriorated. And there's lots of testimony talking about the way depression is shown and things like that. So is it your position then that to support an award for emotional distress, there doesn't need to be a link to a deviation in the standard of care? That is the link. The link is that he went from Good Samaritan Hospital, where he had all of the care, to a place where he didn't have any. And so he's having, so that he is plotting. That's just a natural probable consequence of the deviation. Yeah, that he is plotting and planning out a potential suicide attempt shows that he's mentally deteriorating. And that's something the jury can hear all that evidence and consider the evidence that There's no evidence that he was plotting after he was released to do that. There is no direct evidence that he was plotting. But what we know is that his suicide attempt is that he went up to the 16th floor. There's no evidence. You said there's no direct evidence. There's no direct evidence. There's circumstantial evidence. Because what we know he did is that his suicide attempt, not attempt, his suicide was that he went up to the 16th floor. He moved an ice chest. He used a butter knife to unscrew latches to be able to get outside. But that was immediately following the intervening event of the service process on the order of protection. So before the service and the time that he was discharged, there was no plotting going on that's in the evidence. But circumstantially, and Judge Brozahan noted this in her post-trial ruling, there's circumstantial evidence that he didn't decide when he got the order of protection, okay, I'm going to go jump off the roof. He had to have already figured out what he was going to do. He may have decided, okay, this was the final stressor that's pushing him over to commit suicide. But in order to be able to do it the way he did it, that's something that had to have been planned out. I mean, I would have been sure he could reasonably find that circumstantially, since it defies belief that he would have just gone up to the 16th floor, looked around, oh, was able to find an ice chest to move it, oh, here I got the butter knife from the dirt floor and undid it and all that. So circumstantial evidence that this is what he was thinking about this, that his mental health was deteriorating and he was going beyond just having thoughts of suicide ideation, but also working out how to actually do it. But it's circumstantial evidence, not direct evidence. Absolutely, I didn't mean to misspeak there. But again, you know, in a JNOV, the reasonable inferences that can be drawn from the evidence have to be done in favor of the plaintiff, and that's certainly what that is, and that's what Judge Brozahan found as well. Could you address this just odd situation related to the on-again, off-again testimony of the daughter? And what kind of, at least in reading the defendant's account, it seems almost like a flim-flam in terms of, oh, we're not putting her on, we are putting her on, we're not going to let her sit for a deposition, we want guardrails, you know. How did all that, how did that happen? In the briefs, there's a really detailed discussion. I'm going to sort of try to do it shorter, but it's sort of hard. But essentially, the complicating factor in all this is that Ella and Tommy, they didn't know that their father, they knew their father died, but they didn't know he committed suicide, and they didn't know there was an order of protection out there. And that was the decision that the mother had made. And so the question is what to do to have these deposed, have them deposed. They were both, both children were deposed. I think we got that. It's 213. We read the briefs, and we, I guess what I'm asking you to address is what counsel said. It's just really unfair prejudice to her client in that they learned facts in this deposition taken the night before testimony that they were never able to test. Right. Well, the fact that they learned was that she went to, the only fact of the issue in that is that she went to grief counseling because of issues with her weight and also with her father. So that's the only fact, that issue there. So, and that was only like two or three questions in the direct examination, so I'm not sure what the unfair prejudice of this is anyway. The trial court found that there was no 213 violation because there wasn't. It's one of those, if you look in hindsight, you can say, oh, this didn't seem right and all that. But still, if you also look in hindsight, plaintiff's counsel was very clear that she was not going to allow Ella to be subjected to learning, either in a deposition or on the stand, that her father committed suicide or that there was the order of protection. So if, and she indicated to defense counsel that if you want to do that, I'm going to file a motion and we're going to bar it. And if the court finds that the advocate could go into those issues, she's not going to call him as a witness. If the court finds that that is not relevant, which is ultimately what the court found, if the court finds that, and then we're going to present her for trial. Advocate could have filed a motion to compel at that time. This is going on in March and April. Could have filed it before then when originally, at the very first time, they could have filed a motion to compel as well and brought all of this ahead sooner than when it was. It didn't come to head until beginning of trial, and then I think it's very clear from the record, that the trial judge spent a lot of time thinking about this. And there were several times she addressed it until it finally got to where they took the deposition on the 5th. It was originally scheduled actually for the 2nd, the evening of the 2nd, so they had more time as well. But a, the. She wasn't on the witness list. Well, she originally was because she was on the 2-13. Then, right, later on, not on the witness list, but then she was put back on it. And I apologize, I can't tell you the timing of exactly when, but it was more, they were engaging in discussions in March and April, and there were e-mails about that, about her being on it. So even if they had not formally updated, there were still discussions throughout that she was going to be called, but that the younger woman was not. But ultimately, it was not unfair prejudice. And also, there's not a violation. But it wasn't prejudice because it made the jury sympathetic, overly sympathetic to her. Because that she went to grief counseling for her weight, and for her father. I think that that was not, that's not, that's, it's just that little, it's that little sliver. It's not, they were sympathetic to her because she testified, and she was allowed to, about her relationship with her father, and that was properly in her 2-13 disclosure, very, very clear, to talk about the loss of society, to talk about her relationship with her dad, how her dad was her best friend, how even though when she was a teenager, and hormones were eroding, she would get angry, he was still always her best friend, and the loss of her life. But the trial judge didn't allow her, didn't allow her to be examined about the order of protection? And ultimately, I guess defense counsel made a decision in the trial after examining her about the suicide, but is that factually correct? The, and we need to be very precise here. It is factually correct that the judge would not allow Ellis to be cross-examined about the order of protection, about the existence of the order of protection. The judge reasoned that in part she didn't know about it, she wasn't going to testify about it in direct, so it would be beyond the scope. But the judge also found that the information contained in the order of protection that refers to Ella, she could be examined about. She just could not be asked, that information came from the order of protection, can't refer to the order of protection, but all of the information in the order of protection could be asked about, as well as if you wanted to ask how he died. But, and even, even advocate counsel admitted that if I would ask her, do you know about the order of protection, and she said no, then I'm done. I have, there's nothing else I can ask on that. So. Can you address the remitterer before you conclude? Absolutely. And I don't know how much time I have left. You don't need to. Oh, there is. I'm sorry. It's okay. That's why she's precise. I will keep it brief regardless. Well, with respect, I think we've already addressed the evidence with respect to his emotional distress. So I think the way to focus is on the wrongful death claim. And it didn't, it doesn't reach the level, it's not at the outer bounds, the amount that was awarded. There was evidence presented about the loss of society of the entire, of the entire family. There was testimony about how the relationship that Mr. Toronto had with his son, how they would sing songs, and how he missed his dad, and that when there were thunderstorms afterwards, he would cry out for his dad. There was testimony from, from Bessie about how they planned to grow old together and all these things. There was testimony about, Ella testified about the effect on, on her as well. There, there is. He had been out of the house for quite some time at that point, correct? Well, he had been out of the house since December. Since, since December. But when you look back, when the, the earlier, and there was testimony presented I think through, through Maria and others, that after what happened in the summer of 2014, when he came back, he was back to normal, and he was getting closer to normal, and he was engaging back in the family. So clearly, the, the, there's evidence that the jury could find that the, the estrangement caused, which was caused by his mental health issues, but that if those became under control, he would continue to go back to the way he was and have a strong relationship with the family. So any estrangement is, is, it wasn't a permanent estrangement, which is usually these cases when there's estrangement, is one where they haven't seen someone for years and years. Here, they didn't see him because he was, they, he was seeking medical treatment for his mental health. The child was divorced prior to. In 1999, Your Honor, and then withdrew it. They had Ella in 2000. So this was 14 or 15 years earlier. That certainly, I mean, absolutely, there are ups and downs in a marriage, but to say before the decision was made to have, to have a family with someone, I was thinking of, of divorcing, that's not, respectfully, the jury can, can disregard that. Any additional questions from the panel? No. Well, thank you very much, Your Honor. Thank you. You have five minutes for rebuttal. Thank you, Your Honor. I'll, I'll try not to overstep that. Let's go to remitted her because that's the last thing we addressed. There were a lot of misstatements about the record, so I want to clear them up. Can you readjust your mic, please? Is, is this better, Judge? Okay. Okay. So, first of all, as, as to the plaintiff's loss of society, it's pure speculation to say that that was going to be an ongoing marriage. Let's face it. She had just had him served with an order of protection saying no contact for two years. So that's just a leveled matter. And, you know, I think that, I think that the, probably the more accurate inference would be he's not coming back. Now, the, the issue about Ella's deposition testimony, I, I don't accept plaintiff's characterization of what the defense would have done with that. And it's not just a matter of, oh, well, she thought she had some counseling because she was overweight and she felt bad. It goes way beyond that. If we had had the opportunity to get those records, we may have found something that actually dispute, took into dispute her description of this close relationship with her father. But we never had that opportunity. And the only reason we didn't have that opportunity was a, was a flim flam. My honest assessment, Your Honor, if you'll forgive me, is that, that is a nice way of saying it. And what happened was not that, what happened was not that there, this was this overwhelming desire to protect the children. And I will tell you why I make that statement. Because after, as the events went on, now, this, this, I, I, I'm, I have to say, it just amazes me when the other side on this case is saying, well, why didn't you do a motion to compel? They took her off the witness list. That's why we didn't do a motion to compel. We didn't think she was going to be testifying, and we didn't think she was, didn't find out about it until we were in motions in limine. And then back and forth and back and forth. And, well, I'm not going to let her testify, according to plaintiff's counsel, unless the judge doesn't allow cross-examination on how the, the father died. But if there was, if there was such, such a desire to protect, then why at the very end of that situation did plaintiff's counsel say, go ahead? Go ahead. So I, I, I, I think this is beyond gamesmanship. And to, and I, I take exception with my partner being blamed for this kind of behavior from the other side. So, you know, this is unfair prejudice. You bet it was unfair prejudice to have this testimony come out. She should not have been permitted to testify at all, and it was a significant aspect of the plaintiff's closing argument. Ella's, Ella's, you know, loss of her society. Well, we might have, if we had had the opportunity, we might, might have found something else off, something else there. On emotional distress, there is not one case that says that there doesn't have to be a connection between the negligence and the emotional distress. And there was no case that was cited in plaintiff's brief that rebutted the case that I cited in my, in my brief, the Glassman case. So I think that, at an absolute minimum, that issue, that award should be knocked out. And, and the estrangement between the plaintiff and her husband and the kids and their father, that has to be taken into account, in my view, should be taken into account. I'm not going to tell the court what he has to do. Let's talk about Dr. Jacobson's qualifications. You know, he, he wrote a chapter in a book, and if, if, can he talk about, maybe he can talk about assessment, I don't know. But he certainly, he hasn't discharged a patient or been the treating physician, the treating psychiatrist for a patient since the 80s. He hasn't been the ECT teacher even since the 70s. How in the world is he qualified? How in the world is he familiar with this, with that prong of the qualification? He doesn't have the familiarity, and it was an abuse of discretion. Fulton Township says that he teaches people to do those. He, he, his, he has, has, occasionally he says he will teach. He's not a full-time, that he sort of glossed over. He's not a full-time professor. He's not a full-time teacher at Harvard. He has had some occasional teaching experience. All of which was gone over during his cross-examination, to go to the weight that the jury should consider that evidence in his testimony. It, it, it does, but let me say this. Every little bit, we know from this case, we know from the three days of, of deliberation, we know that every, every inch of error made a difference in this case. And I, and I don't, and I handle a lot of appeals, and I don't frequently find that. I don't find three days of deliberation, and I don't find a juror who says, I, I just don't think I can, I can find against your client. That is very significant in this case. Now, now this, this, this business about reviewing the records, and it was no big deal, that that was, that was, that just came out when my partner got up to do the cross-examination. I'm an appellate lawyer. I don't try cases. I'm, I'm not sure about my very, very excellent appellate lawyer counsel. But I know that it's not just a matter of, oh, there would have been one question about, oh, you didn't, you didn't look at that, you didn't look at that first. That was going to be a major feature of his cross-examination. And this is, you know, it's just one expert here. We just had one expert to challenge, and he would have destroyed him. He, and, but this, but this business of all of a sudden, oh, yeah, I did look at those things. So it's not just a matter of showing he didn't know things. It's a matter of showing. It's a truth-seeking function. So it wasn't something that was misleading. There's no unfairness stemming from the witness was allowed to testify in a manner that was misleading. It turned out that your dramatic moment, I don't know, what was it, a Matlock moment, you didn't have it. Okay. But is that the sort of unfair prejudice that mandates a reversal? Absolutely, Your Honor, because that's why we have Rule 213. We have Rule 213 so that the trial lawyers know what they're dealing with when they come in to try a case. And it's not fair for, so, you know, you can think of cases. I mean, a hypothetical is coming out of my mouth. And this is a hypothetical. What if he said, you know what, I've got another causation opinion, and this is truthful. Well, you can't do that. We get to rely on it. I'm sorry the name is so expensive. Counsel, why didn't you put your own expert on? We did have our expert. But this is, you know, this is something, this is in the middle of the trial, Your Honor. This is in the middle of the trial. So it's not, we're not going to, you know, we do have our expert. But that's not the same thing as just spreading them there. They have the burden of proof. But the trial judge tried to fashion a remedy, right, in saying, okay, he's not going to be allowed to testify about that. Yeah. The slip on the hand. And he testified it again and again. So when the question comes out, he says, oh, yeah, I read that stuff. So we don't have, what we don't have is showing that, is showing the lack of integrity of somebody, which we were relying on, who says, this is a breach of the standard of care, but I'm going to accuse this doctor of causing this man's death without looking at the important records. That's huge. And we cited a case in our brief that recognized the importance of being able to impeach an expert. The, oh, I think it starts with a K. I'm sorry, I don't have the case name of the time I had a camera or something like that. That's huge. And that's what I'm, that's what I'm getting excited about. Let me just briefly say also on the issue of actual cause. This is an issue that counsel, first of all, he, again, he states the standard, and it's not quite right. Reasonably foreseeable result of defendant's conduct is what counsel said. No, it's of the negligent conduct. And the negligence isn't established by Dr. Jacobs to a degree that it can be connected to the outcome. And part of the reason is because he doesn't know what people do when they discharge. He doesn't know what kind of orders they write. He's not that kind of a doctor, so he's speculating. He also didn't know and didn't say what was the, what kind of care was going to be at that independent care facility. That was their bottom. He didn't say that. So, you know, there's a lot of discussion today, and I think it's a very good question. But the answer to the question is the plaintiff didn't tell the court. The plaintiff didn't tell the jury. And so that, you know, that's substantially different. And I have to take issue with what counsel said about there's basically nothing going on, no support at Concord Place. That's not true. There was support. He saw three physicians. Circumstantial evidence has got to be supported by some factual basis. It's not a way to say, okay, well, this happened, so now we can speculate about what happened. So to say that there is circumstantial evidence that there was some sort of a plan by Mr. Carano is not something that the court, in my view, should be considering. And what about Dr. Meagher? Let me just say that in ramping up here. And he is the one who saw Mr. Carano within hours. And he is a very highly trained physician, highly trained psychologist, and he didn't see any of it. 45-minute session. So I think that takes care of the circumstantial evidence. So was he served before or after? After. I thank the court for letting me go over time and for inviting us to this fabulous facility. And I ask for all of the relief, you know, alternatively, that we have in our brief. Thank you so much, Your Honors. Thank you. And I thank both councils for your passionate presentations on today. This was a difficult case, and there's a lot at stake here, and that does not go unnoticed by us. I appreciate your willingness to come out to this landmark building. I thank Operation PUSH for hosting us on today. It is our hope that the community will appreciate the opportunity to learn more about what it is our justice system does. And we're going to take your arguments under advisement, and we will issue our ruling as soon as possible, as soon as we can. Thank you so much, everyone. Be well. At this time, if there are any questions from the audience about the process, as opposed to the actual facts of this particular case, we'll certainly entertain them at this time. Okay. All right. Very well. Thank you so much, everyone. Be well.